UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John Henry YABLONSKY,<br><br>                                    Plaintiff,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF<br>CORRECTIONS & REHABILITATION,<br>et al.,<br><br>                                    Defendants. | Case No.:  18-cv-1122-CAB-AGS<br><br>**REPORT AND RECOMMENDATION<br>ON DEFENDANTS' MOTION TO<br>DISMISS (ECF 33)** |

In this civil-rights suit, the inmate plaintiff accuses prison officials of unconstitutionally reading his legal mail, limiting his law-library access, retaliating against him for filing grievances, and discriminating against him because of his disability. After some of his original claims were dismissed, plaintiff amended his complaint. Defendants again move to dismiss.

## BACKGROUND

As required at this early stage, this Court accepts "all factual allegations in the complaint as true and constru[es] them in the light most favorable to the nonmoving party." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016) (citation omitted). Viewed in the light most favorable to plaintiff, these are the relevant facts:

In October 2015, plaintiff John Yablonsky suffered a stroke, which left lingering damage to his vision and mobility. (ECF 32, at 24, 72.) About eight months later, he arrived

1

at Richard J. Donovan Correctional Facility, where the events of this case unfold. (*Id.* at 19.)

His troubles began at the prison law library. When he tried to copy some papers for his legal-related correspondence, the library staff—defendants Tiscarnia, Powell, Blahnik, and Robles—read through his "protected papers addressed to Courts and Lawyers . . . . one page at a time." (ECF 32, at 19-20.) They even placed his papers "face up" on "the counter in front of everyone in the law library." (*Id.*)

After Yablonsky filed grievances about this, prison staff reduced his law-library access and came to his cell to remove "legal papers," which were the product of "hundreds of hours of [law-library] research" over "four years." (ECF 32, at 21, 23.) While he was enduring all this, Yablonsky suffered several bad outcomes in legal cases. (*Id.* at 23-26.)

In January 2017, defendant Martinez interviewed Yablonsky in a dimly lit room regarding his appeals against prison staff. (ECF 32, at 30, 73-74.) Martinez asked Yablonsky to withdraw his appeals because "people would []more than likely lose their jobs if this was not withdrawn." (*Id.* at 30.) In exchange, he promised to help return Yablonsky's legal papers, but never did. (*Id.*)

Yablonsky kept filing grievances and kept having trouble with prison officials. For example, defendant Robles "created a fake rule about [the] law library" in order to reduce Yablonsky's access and also filed a "false report" against him. (*Id.* at 31.) Defendant McGuire placed labels over Yablonsky's "legal mail," which resulted in the mail being initially "returned as undeliverable." (*Id.* at 32, 64, 75.) And an unidentified prison employee interviewed Yablonsky about his appeals and made "threats" to Yablonsky that were "understood as lethal." (*Id.* at 68.)

## DISCUSSION

The government moves to dismiss Yablonsky's amended complaint entirely, as well as several specific claims.

### A.      Motion to Dismiss For Failure to State a Claim

To survive a motion to dismiss, a complaint must contain enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *see also* Fed. R. Civ. P. 12(b)(6). Plaintiff must lay out facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[N]aked assertions devoid of further factual enhancement" will not suffice. *Id.* (alterations, citation, and quotation marks omitted). Pro se pleadings demand an especially charitable interpretation, but the court "may not supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).

### B.      Access-to-Courts Claim

The government moves to dismiss Yablonsky's access-to-courts claim for failing to sufficiently plead actual injury. (ECF 33, at 12.) To satisfy the actual-injury requirement, plaintiffs must allege hindered "efforts to pursue a legal claim." *See Lewis v. Casey*, 518 U.S. 343, 351 (1996). Specifically, plaintiffs must identify a link between a defendant's "constitutional misconduct" and an "adverse disposition" in plaintiff's underlying case. *Simkins v. Bruce*, 406 F.3d 1239, 1244 (10th Cir. 2005); *see also Christopher v. Harbury*, 536 U.S. 403, 418 (2002) (denying an access-to-courts claim because "the complaint failed to identify the underlying cause of action that the alleged deception had compromised"). This is because "the right at issue is not the right to a law library or the right to receive one's mail; it is the right to access the courts to press a claim." *Penton v. Pool*, 724 F. App'x 546, 549 (9th Cir. 2018) (quotation marks omitted).

#### 1.  Law-Library Access

Yablonsky complains that, despite repeatedly notifying prison staff of "deadlines for his cases," they reduced his "access into the library . . . to less than the time allot[t]ed by government code CCR 3122 [regarding Priority Legal Users]." (ECF 32, at 21; *see also id.* at 22 (library access "being frustrated and stopped"); *id.* at 64 ("insufficient" library time to "seek and find out available remedies").) As a result of his inadequate research time, he

3

maintains that he lost: (1) his U.S. Supreme Court certiorari petition and rehearing motion; (2) various state-court "post[-]trial developing motions" on the DNA evidence in his underlying criminal case; and (3) an unspecified November 2016 hearing. (*Id.* at 25, 28.)

To survive a motion to dismiss, Yablonsky must plead enough facts to make it plausible that he lost some court proceeding or legal right *because of* his limited law-library access. *Compare Stevenson v. Beard*, Case No.: 16-CV-3079 JLS (RBM), 2020 WL 1245393, at *7 (S.D. Cal. Mar. 16, 2020) (no actual injury when inmate had some "access to legal research resources," filed "several pleadings and motions without impediment," and failed to allege that limited law-library access "caused an inability" to pursue his legal claims), *with Penton*, 724 F. App'x at 550 (actual injury when prisoner's loss of library access "frustrated his ability to timely object to the magistrate judge's . . . report and recommendation, and to timely appeal the district court's . . . denial of his habeas petition"), *and Hebbe v. Pliler*, 627 F.3d 338, 340-41, 343 (9th Cir. 2010) (actual injury when inmate "spent approximately seven months in lockdown, without access to the law library," causing him to miss a briefing deadline, which "impermissibly denied [him] the opportunity to appeal his conviction").

Yablonsky's amended complaint sheds little light on this crucial nexus between the alleged misconduct and the adverse result. He doesn't claim that he missed any deadlines in his many legal matters.[1] (*See, e.g.*, ECF 32, at 24-25, 104-13.) And he has not identified even one legal argument that changes the result of a proceeding he lost. For example, if Yablonsky's certiorari petition was indeed wrongfully denied, he should explain the winning legal point that he missed for lack of library time. He has had years to complete any short-circuited research. Yet, even now, he has not discovered anything that might undermine these unfavorable rulings. His conclusory assertion that more library hours

---

[1] He makes passing reference to the "loss of possible deadline compliance for these post[-]trial actions," but he never offers any facts regarding actual missed deadlines. (*See* ECF 32, at 59.)

would have reversed his legal fortunes amounts to "naked assertions devoid of further factual enhancement." *See Iqbal*, 556 U.S. at 678.

Even under the more generous standard for pro se pleadings, Yablonsky has not sufficiently alleged that his diminished library privileges caused any actual injury.

### 2. Mail Tampering

Yablonsky claims that defendant McGuire placed labels over the address section of his outgoing mail to prevent delivery to the courts. (ECF 4, at 31-32; ECF 32, at 64.) To state a denied-access claim for interfering with an inmate's mail, plaintiff must tie defendants' obstruction "to a lost, nonfrivolous legal claim." *See Penton*, 724 F. App'x at 549.

Although Yablonsky points out that the mail was initially "returned as undeliverable," the ultimate impact of this label mischief is unclear. (*See* ECF 32, at 75.) Even if some mail was delayed, Yablonsky does not explain how this caused him to lose any particular legal claim. (*See id.* at 63-64.) So he fails to establish any actual injury.

### 3. Seized Paperwork

Yablonsky accuses prison officials of snatching his legal paperwork to "bring plaintiff['s] actions to a grinding ha[]lt," but fails to divulge what harm ultimately came from it. (*See* ECF 32, at 26, 73-74.) In fact, Yablonsky admits that on November 17, 2016, some of the confiscated files were returned, but never explains which ones, or to which ongoing cases they related. (*See id.* at 28.) Finally, he mentions that some "hearing was lost as a result of" his notes being taken (*id.*), but he does not address what effect that had on the overall disposition of his case. Yablonsky thus leaves the Court "to guess at the unstated cause of action supposed to have been lost," which dooms his seized-paperwork claim. *See Christopher*, 536 U.S. at 418.

### 4. Reading of Legal Mail

Lastly, Yablonsky alleges that prison officials hindered his court access by routinely reading his mail. (*See* ECF 32, at 62-63.) But he never explains how the mail-reading

effectively shut him out of court or resulted in an adverse result. (*See, e.g.*, ECF 32, at 33, 35, 37, 39, 41, 45, 50, 63-67.) As with his other denied-access claims, this failure is fatal.

Although this is Yablonsky's second attempt to successfully state an access-to-courts claim (*see* ECF 30, at 4-5), he should be granted leave to amend one last time. His current pleadings come closer to stating a claim than in the past. And leave to amend "should be granted more liberally to pro se plaintiffs." *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003); *see also Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (holding that pro se litigants must be granted leave to amend "unless [a court] determines the pleading could not possibly be cured by the allegations of other facts" (citation omitted)).

## C.    Free-Speech Claim

Yablonsky alleges that the prison's policy of reading the contents of his outgoing legal mail chills his First Amendment right to free speech. Defendants move to dismiss this claim, arguing that the mail-reading is a necessary precaution and that the letters were meant for court-filing and thus are public matters anyway. (ECF 33, at 18-19.)

Although Yablonsky "enjoys a First Amendment right to send and receive mail," a prison may institute policies that curtail that right "if those regulations are 'reasonably related to legitimate penological interests.'" *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curiam) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). When the "regulation affects outgoing mail as opposed to incoming mail," however, "there must be a closer fit between the regulation and the purpose it serves." *Id.* Courts have upheld limited safety inspections of outgoing inmate mail, so long as officials do not read the contents of letters bound for courts or public officials. *See id.* at 266 (upholding regulation that allowed prison staff to "perform a cursory visual inspection" of outgoing mail to public officials, but not to read "any portion of the contents" except the return address); *O'Keefe v. Van Boening*, 82 F.3d 322, 323, 327 (9th Cir. 1996) (upholding policy permitting inspection of mail other than that "to or from courts and court staff [or] attorneys"); *Royse v. Super. Ct. of Wash.*, 779 F.2d 573, 574-75 (9th Cir. 1986) (upholding "prison mail security order"

that authorized "minimally intrusive" inspection for contraband within court-bound mail, but did not allow "reading inmate mail"); *Salerno v. Munoz*, No. CV 10-08580PHX-ROS (LOA), 2011 WL 13142486, at *7 (D. Ariz. Nov. 3, 2011) (interpreting *Witherow* to hold that "inspection of mail to public officials is permitted only if officers do not read any portion of the contents").

### 1. Inspecting Mail for Contraband

First, defendants contend that the "librarians' policy of inspecting Plaintiff's legal papers for contraband before making copies" is a necessary safety precaution that does not run afoul of the First Amendment. (ECF 33, at 18.) But defendants misunderstand Yablonsky's grievance. He doesn't contest the legality of a genuine inspection for contraband. Rather, he maintains that prison staff exceeded the limits of a minimally invasive contraband inspection and instead unconstitutionally read the contents of his legal correspondence. (*Cf.* ECF 32, at 21 (citing 15 C.C.R. § 3142(d), which requires that prison officials "remove [mail] upside down to prevent reading of the contents" and "shake [the mail] to ensure there is no prohibited material").)

Because Yablonsky is disputing the allegedly unconstitutional reading of his mail— not proper inspections for prohibited items—defendants' motion to dismiss on the ground that they are allowed to conduct contraband inspections should be denied.

### 2. Reading Inmate Mail

Second, defendants argue that Yablonsky's outgoing mail was "being sent to various courts for filing," making it "part of the public record" and not confidential. (ECF 33, at 18.) Again, defendants misread Yablonsky's complaint: he alleges that the scrutinized legal papers were "correctly addressed . . . to Courts *and Lawyers*." (ECF 32, at 20 (emphasis added).) Letters to attorneys would not necessarily become public. Even for court-bound mail, Yablonsky could have asked that certain sensitive documents be filed under seal or reviewed only *in camera*, to keep them out of the public domain. At any rate, Yablonsky's complaint does not support defendants' assumption that each letter was destined for public airing.

Defendants may have legitimate reasons for poring over outgoing prisoner mail to courts and attorneys, and they need not "satisfy a least restrictive means test" to justify that policy. *See Witherow*, 52 F.3d at 265. (Notably, they have not yet offered a justification. And this Court has found no cases permitting such a practice.) Yet, at this stage the Court's analysis is limited to the facts in the complaint, which do not disclose any basis for such a policy. *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016). Thus, defendants' motion to dismiss the free-speech claim should be denied.

**D.   Retaliation Claim**

Defendants also move to dismiss Yablonsky's First Amendment retaliation claim. They argue that the alleged facts do not support a finding of any retaliatory motive, any improper purpose in taking his library notes, nor any adverse action tied to conduct of certain defendants. (*See* ECF 33, at 14–17.)

In general, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). For prisoners to maintain a First Amendment retaliation claim, they must set forth: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (citations and footnote omitted).

**1.   Adverse Action Against an Inmate**

For the first element, "[t]he interest cognizable in a retaliation claim is the right to be free of conditions that would not have been imposed but for the alleged retaliatory motive." *Garcia v. Blahnik*, No. 14cv875-LAB-BGS, 2017 WL 1226863, at *10 (S.D. Cal. Feb. 3, 2017). While defendants argue that Yablonsky fails to "attribute specific retaliatory conduct to any one Defendant," his complaint indicates otherwise. Yablonsky describes a coordinated plan by each defendant librarian to read his legal mail, file false disciplinary reports to curtail his library access, and confiscate his "legal files." (*See, e.g.*, ECF 32,

8

at 66-69); *see Rhodes*, 408 F.3d at 568 (holding that first element was met when prison guards "arbitrarily confiscated, withheld, and eventually destroyed [plaintiff's] property, threatened to transfer him to another correctional institution, and ultimately assaulted him").

In particular, Yablonsky details how Blahnik, Powell, Robles, and Tiscarnia ordered or assisted in the reduction of his "access into the law library" (ECF 32, at 66-68), and how Robles wrote "false disciplinary reports" intended to accomplish the same. (*Id.* at 67.) In response to Yablonsky "writing staff complaints," Martinez engaged in a "bait and switch": Martinez asked Yablonsky to withdraw his library appeal, offering to get Yablonsky's confiscated files returned, but instead instigated the withdrawal of his file-confiscation complaint. (*Id.* at 30, 68.) Yablonsky also says that an unknown defendant made "lethal" threats to him (*id.* at 68), and that McGuire "plac[ed] labels over the address" on his letters "to prevent delivery" (*id.* at 16) and ordered "the taking of [Yablonsky's] research notes from his possession." (*Id.* at 64.) So Yablonsky satisfies the adverse-action element.

## 2.  "Because Of": Retaliatory Motive

As to the second element, a plaintiff must allege "that by [their] actions [defendants] deterred or chilled [plaintiff's] political speech and such deterrence was a substantial or motivating factor in [defendants'] conduct." *See Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quotation marks omitted). A plaintiff successfully alleges such a motivating factor by including facts like: "(1) proximity in time between protected speech and the alleged retaliation; (2) that the defendant expressed opposition to the speech; or (3) other evidence that the reasons proffered by the defendant for the adverse . . . action were false and pretextual." *McCollum v. CDCR,* 647 F.3d 870, 882 (9th Cir. 2011) (alterations and quotation marks omitted).

Yablonsky points out that he filed appeals against prison staff, after which defendants threatened him, limited his library access, read his mail, placed a label on his outgoing correspondence, and confiscated his library notes. (*See* ECF 32, at 66–69.) He alleges they took these actions to "get even" with him and cause a "chilling effect" upon

9

the exercise of his First Amendment rights. (*See id.*) He also describes being coerced to withdraw one of his appeals. (*See id.* at 40, 73-74.)

Defendants respond that Yablonsky's mail was being read before he ever challenged this policy, so it was an "ongoing practice," not retaliation. (ECF 33, at 16.) They have a point: Yablonsky admits that the mail-reading began upon his arrival at Donovan, and he never suggests that his administrative complaints made it any worse. (*See, e.g.*, ECF 32, at 19-21, 32-33, 66-69.) Because the mail scrutiny predated the lodging of his grievances, the Court cannot infer that Yablonsky's protests spurred officials to read his mail in retribution. (*See id.*) So defendant's motion to dismiss should be granted as to this discrete retaliation theory.

But Yablonsky successfully pleads a retaliatory motive for defendants' other alleged transgressions. The temporal proximity of these events reasonably suggests vengeful intent, especially when combined with the suggestion that library staff would "more than likely lose their jobs" due to Yablonsky's appeals. (*See id.* at 30.)

### 3. Protected Conduct

Yablonsky's complaint-filing against prison staff is indisputably protected conduct. "Of fundamental import to prisoners are their First Amendment 'right[s] to file prison grievances.'" *Rhodes*, 408 F.3d at 567 (citation omitted).

### 4. Chilling Effect

The fourth element requires that defendants' challenged conduct "would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envtl. Ctr.*, 192 F.3d at 1300 (citation and quotation marks omitted). An official's "lethal" threat would certainly chill a person of ordinary firmness, especially when it was part of other coordinated retaliatory actions, including fake disciplinary reports, reduced law-library access, reading court-related correspondence, placing an obstructing label on outgoing mail, and confiscating library notes. (*See* ECF 32, at 66-67; *id.* at 39 ("defendants acted in concert . . . when they retaliated" against Yablonsky).) Thus, Yablonsky satisfies this element. *See Watison v. Carter*, 668 F.3d 1108, 1116 (9th Cir. 2012) (holding that the

10

"threat of physical violence" was "chilling conduct"); *Millare v. Stratton*, No. 16cv1633-BAS-MDD, 2017 WL 9604609, at *5 (S.D. Cal. Feb. 28, 2017) (finding chilling-effect element met when plaintiff alleged "Defendants collectively conspired to chill" his first amendment rights when they "filed false [Rules Violation Reports] . . . and improperly rejected, cancelled, or otherwise handled his inmate appeals"), *adopted by* 2017 WL 1277798 (S.D. Cal. Apr. 6, 2017).

### 5.  Lack of Legitimate Correctional Goal

For the final element, plaintiff must allege that "prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985); *see also Garcia*, 2017 WL 1226863, at *11. "A plaintiff [can] successfully plead[] this element by alleging, in addition to a retaliatory motive, that the defendant's actions were arbitrary and capricious, or that they were 'unnecessary to the maintenance of order in the institution.'" *Watison v. Carter*, 668 F.3d 1108, 1114-15 (9th Cir. 2012) (quoting *Franklin v. Murphy*, 745 F.2d 1221, 1230 (9th Cir. 1984)).

Here Yablonsky accuses defendants of trying to "get revenge" and "get even" with him for filing prison grievances. (ECF 32, at 66-69.) In addition to that retaliatory motive, Yablonsky describes various acts by defendants that were arbitrary, capricious, or unnecessary, like making threats and filing false disciplinary reports. These allegations sufficiently suggest that defendants lacked a legitimate correctional reason for their conduct. *See Rizzo*, 778 F.2d at 532, 532 n.4 (finding fifth element satisfied by allegation that defendant "recommended [plaintiff's] reassignment on the basis of too many library passes," which was "retaliatory[,] . . . arbitrary and capricious"); *Jones*, 68 F. App'x at 800 (holding that "filing false disciplinary reports could not have a legitimate purpose"); *Millare*, 2017 WL 9604609, at *6  (concluding that fifth element was met by allegations that "Defendants retaliated against Plaintiff's 'litigiousness' by improperly handling his appeals," which amounted to conduct that "was 'arbitrary and capricious'" (citations omitted)).

11

On his claims regarding threats, false disciplinary reports, file confiscation, library access, and the "bait and switch," Yablonsky satisfies all five elements, so defendants' motion to dismiss his retaliation claim should be denied. Yablonsky fails to allege a retaliatory motive behind defendants' continued reading of his mail, so that claim should be dismissed. But because Yablonsky could cure that deficiency by alleging other facts, he should be granted leave to amend.

## E.   ADA Disability-Discrimination Claim

Defendants move to dismiss the cause of action under the Americans with Disabilities Act (ADA), asserting that Yablonsky's "allegations are too vague to state a claim" and that his amended complaint "fails to describe exactly what accommodations [Yablonsky's] impairment requires." (ECF 33, at 19.) Yablonsky contends that his reduced library access, his placement in a dimly lit room, and the confiscation of his library notes were based on his disability and therefore violated the ADA. (ECF 32, at 72–76.)

To state an ADA disability-discrimination claim, plaintiff must allege that:

> (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of his disability.

*Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th Cir. 2018) (alterations and citation omitted).

### 1.   Disability

Yablonsky avers that he is an "ADA inmate with permanent disabilities affecting his mobility as well as vision." (ECF 32, at 72; *see also id*. at 14, 18, 34, 37, 72-73, 76, 347, 348, 360.) After a stroke, he "lost the ability to walk without falling" and developed "double vision," which makes it difficult to read. (Id. at 76.) He was placed in the Sensitive Needs Yard and "medical housing units." (*Id*. at 24, 26, 72; *see also id*. at 19.) Yablonsky has adequately pleaded a disability. *See* 42 U.S.C. § 12102(1)(A) & (2)(A) (defining a

12

disability as a condition "that substantially limits one or more major life activities," including "seeing," "walking," and "reading"); *Acosta v. Martinez*, No. 119CV00307AWIEPG, 2020 WL 1026890, at *5 (E.D. Cal. Mar. 3, 2020) ("The ADA defines disability to include substantial limitations upon an ability to walk."); *Anderson v. Hernandez*, No. 15CV993-BEN (BLM), 2016 WL 11448148, at *7 (S.D. Cal. June 20, 2016) (finding an adequately pleaded "disability" when plaintiff alleged that "he is a vision-impaired inmate"), *adopted by* 2016 WL 4501072 (S.D. Cal. Aug. 29, 2016).

### 2. Qualified to Receive Benefits

As an inmate, Yablonsky was generally qualified to participate in or receive benefits from prison services, programs, or activities. Specifically, he alleges that he was entitled to extra library access as a Priority Legal User because he had pending court deadlines. (*See* ECF 32, at 42, 347; *see also id.* at 546 (prison operations manual: "[i]nmates with verified court deadlines will have priority access to the Law Library 30 days prior to the expiration of that court deadline as a PLU. . . .").) Thus, he has adequately pleaded his entitlement to the benefits at issue.

### 3. Exclusion, Denial of Benefits, or Discrimination

Yablonsky's best argument for satisfying the third element is that he was denied the benefits of Priority Legal User status and its law-library privileges. The other indignities that Yablonsky describes may not qualify under the ADA as a denial of services or program benefits. But this Court will assume, without deciding, that Yablonsky has met this element. *See Roberts v. CDCR,* No. 2:12-CV-0247 KJM AC, 2014 WL 2109925, at *10 (E.D. Cal. May 20, 2014) (denying defendant's summary-judgment motion because "[a] rational trier of fact would be able to find" discrimination against plaintiff's ability-to-walk disability and that he was consequently "denied access to . . . law library . . . services"). Yablonsky's toughest obstacle is the last element.

### 4. "By Reason of His Disability": Causation

Finally, plaintiff must adequately plead that any "exclusion, denial of benefits, or discrimination was by reason of his disability." *Vos*, 892 F.3d at 1036. The "by reason of"

13

language "should be read to require only 'but for' rather than proximate causation." *See UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1017 n.7 (9th Cir. 2013) (collecting cases interpreting "by reason of" in various contexts).

Although Yablonsky's amended complaint spans 772 pages with exhibits, it offers almost no factual support, beyond the bare allegation, that he was denied benefits *because of* his disability. He provides nothing to bolster his claim that the confiscation of his legal paperwork or his placement in a dimly lit room were "by reason of" his disability. And he suggests various non-disability-related motivations for his reduced library access, including that defendants: (1) claimed Yablonsky "had not shown an exist[]ing deadline," as required for Priority Legal User status; or (2) retaliated against him "[a]s a direct result of plaintiff filing [prisoner grievance] forms." (ECF 32, at 21, 42.)

Only two passing references in the amended complaint come close to a satisfactory causation allegation, but both fall short. First, Yablonsky mentions that there are "restrictions on the law library from [Sensitive Needs Yard] inmates, specifically plaintiff." (*Id*. at 26.) But he never explains what the Sensitive Needs Yard restrictions are precisely. Second, Yablonsky states that he "had a stroke on October 15, 2015" and was placed in "medical housing units which offered minimal library access." (ECF 32, at 24.) Because he only arrived at Donovan Correctional Facility some eight months after this stroke (ECF 32, at 19), Yablonsky may be describing a medical-housing placement at some other facility, before the events of this lawsuit. At Donovan, he repeatedly had the law library's coveted Priority Legal User status. (*See, e.g*., ECF 32, at 52, 211.) Regardless, Yablonsky suggests that this placement was due to his *stroke*—which, again, occurred long before the relevant events—not "by reason of" his asserted disabilities, his ongoing visual and mobility impairments. And even if he had been placed there due to those disabilities, he never explains what "minimal" library access means or how it differs from his preferred access level.

Thus, Yablonsky's ADA disability-discrimination claim should be dismissed, but with leave to amend to address these deficiencies.

14

### F.   Equitable Claims

Defendants move to dismiss Yablonsky's request for injunctive and declaratory relief, because an existing class action addresses the same issues. (ECF 33, at 19–21.)

#### 1.   Injunctive Relief

The only injunctive relief Yablonsky seeks is a "restraining order" to stop prison staff from reading his legal mail and infringing his rights regarding "confidential materials and . . . legal papers." (ECF 32, at 77; *see also id.* at 51.) Because this demand is unrelated to the relief requested in the ongoing class action *Armstrong v. Brown*, No. C 94-2307 CW (N.D. Cal. Filed June 29, 1994), defendants' motion to dismiss the injunctive-relief request should be denied. (*See, e.g.*, ECF 33, at 20-21; ECF 33-1, at 9-66.)

#### 2.   Declaratory Relief

Yablonsky's declaratory-relief action, on the other hand, has much more overlap with the *Armstrong* class-action suit. He seeks "declaratory relief to determine what rights[,] benefits[,] and privileges exist in this matter regarding . . . treatment of handicapped inmates pursuant to the American[s with] Disabilities Act." (ECF 32, at 78.) This broad demand overlaps with *Armstrong*'s February 28, 2013 Remedial Plan, which deals generally with providing "inmates and parolees with disabilities" access to California's prison "programs and services." (ECF 33-1, at 9.)

So, Yablonsky's claim for declaratory relief should be dismissed to avoid "concurrent litigation and potentially inconsistent results." *See Pride v. Correa*, 719 F.3d 1130, 1137 (9th Cir. 2013). But he should be allowed to amend, to specify anywhere that his declaratory-relief request diverges from the Remedial Plan.

### G.   Rule 8

Finally, the government moves to dismiss Yablonsky's case under Federal Rule of Civil Procedure 8, which requires a "short and plain statement of the claim showing that [plaintiff] is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). Specifically, defendants argue that the amended complaint makes it "difficult to determine which acts are attributed to which Defendants" or "which facts support which causes of action[]." (ECF 33, at 22.)

Yablonsky's complaint could certainly be more concise and better organized. Defendants understandably complain that relevant facts for some claims are "interspersed throughout" the amended complaint, making it difficult to match each claim with its factual predicate. (ECF 33, at 22.) If Yablonsky amends his complaint again, each cause of action should be fully set forth in its own separate section, including all the supporting facts for that cause of action.

Nonetheless, Yablonsky's current amended complaint is not so deficient as to require outright dismissal under Rule 8, especially given the more relaxed pleading standards for pro se litigants. Though it could be more artfully written, the amended complaint adequately puts defendants on notice of Yablonsky's claims. And he often supports his claims with more than "[t]hreadbare recitals of the elements of a cause of action." *See Iqbal*, 556 U.S. at 678. Thus, defendants' motion to dismiss for a Rule 8 violation should be denied.

## CONCLUSION

The Court recommends the following order:

1. Defendants' motion to dismiss is **GRANTED** as to these causes of action, which are **DISMISSED WITHOUT PREJUDICE** (that is, with leave to amend):

> a. Access-to-courts claim;
>
> b. Retaliation claim (only as to the mail-reading allegation);
>
> c. ADA disability-discrimination claim; and
>
> d. Declaratory-relief claim.

2. Defendants' motion to dismiss is otherwise **DENIED**.

3. Within 21 days of the District Judge's ruling on this matter, Yablonsky must file any second amended complaint. Yablonsky's second amended complaint must be complete in itself without reference to any prior complaints. Defendants not named and claims not re-alleged in the second amended complaint will be considered waived. *See* S.D. Cal. CivLR 15.1; *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012).

16

Within 14 days of being served with this report, the parties must file any objections to it. *See* 28 U.S.C. § 636(b)(1). The party receiving any such objection has 14 days to file any response. *See* Fed. R. Civ. P. 72(b)(2).

Dated:  June 2, 2020

_____

Hon. Andrew G. Schopler
United States Magistrate Judge

17