UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John Henry YABLONSKY,<br><br>                              Plaintiff,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF<br>CORRECTIONS AND<br>REHABILITATION, et al.,<br><br>                              Defendants. | Case No.: 18-cv-1122-AGS<br><br>**ORDER GRANTING DEFENDANTS'<br>SUMMARY-JUDGMENT MOTION<br>(ECF 168) AND GRANTING IN PART<br>PLAINTIFF'S MOTION FOR<br>JUDICIAL NOTICE (ECF 164)** |

"[B]road as the constitutional concept of liberty is, it does not include the right to xerox." *Jones v. Franzen*, 697 F.2d 801, 803 (7th Cir. 1983). That aphorism largely disposes of this civil-rights lawsuit, in which an inmate accuses prison staff of unconstitutionally burdening his photocopying rights. The inmate also contends that prison officials repeatedly retaliated against him. But those allegations are either unfounded or the challenged actions were justified by legitimate penological interests. Thus, defendants are entitled to summary judgment.

## BACKGROUND

Plaintiff John Yablonsky is incarcerated at Richard J. Donovan Correctional Facility, where he uses the law library. (ECF 168-5, at 22–23.) Library staff schedule library appointments in two- or four-hour blocks. (ECF 168-3, at 2.) But nonlibrary staff are responsible for providing the appointment slips and transporting inmates at the assigned time. (ECF 168-5, at 23–24.) Designated priority users are allowed at least four hours of library access per week. (ECF 168-3, at 2; ECF 177, at 119–20.)

During these sessions, inmates may request copies of their legal documents "necessary for initiating or maintaining a court action." (ECF 168-3, at 3–4.) Copying costs are ten cents per page. (*Id.*) But indigent inmates get photocopies of legal paperwork for free. (*Id.*) Before copying a document, library staff must scan it for contraband, such as "tattoo templates, gang insignia or logos, [non-legal] personal correspondence," or

1

"pornography." (*See id.* at 3–4.) To conduct this inspection, library staff place the documents "face down on the counter . . . within the inmate's view" and flip them over one by one for cursory review. (*Id.*)

Yablonsky sued prison officials under 42 U.S.C. § 1983 for civil-rights violations stemming from this document-scanning policy. First, he charges that the policy violates his First Amendment free-speech rights on its face. (ECF 62, at 39–40, 69–70, 84–85.) Second, he argues that the policy infringes his rights as applied. That is, he contends that before copying his confidential legal documents, the defendant librarians—Blahnik, Powell, Tiscornia, and Robles—actually read them, rather than just glancing over them for contraband. (ECF 62, at 84.) Finally, Yablonsky accuses the defendant librarians, litigation coordinator McGuire, and prison official Martinez of retaliating against him for filing grievances about these misdeeds. (ECF 62, at 79.)

Defendants move for summary judgment on all claims.

## DISCUSSION

### A.   Summary-Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading" and instead "must set forth specific facts showing that there is a genuine issue for trial." *Id.* (citation omitted). There is "no genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party . . . ." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

18-cv-1122-AGS

**B.      Facial Challenge to the Scanning Policy**

Yablonsky first attacks the facial validity of the prison's scanning policy, arguing that it chills his protected speech by forcing him to share his confidential legal documents with his litigation opponents. (ECF 62, at 84–85.)

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). In determining whether a prison regulation is reasonably related to a legitimate penological interest, courts consider the following factors: (1) "whether there is a valid, rational connection between the regulation and the legitimate governmental interest" used to justify the regulation; (2) whether prisoners retain "alternative means of exercising the right" at issue; (3) the "impact accommodation of the asserted constitutional right will have on guards, inmates, and the allocation of prison resources generally"; and (4) whether the prisoner has identified "obvious, easy alternatives" to the regulation that could be implemented at a minimal cost to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89–90 (1987) (quotation marks omitted).

**1.   *Rational Relationship to a Legitimate Governmental Interest***

The first and most critical *Turner* factor is whether the action is rationally connected to a legitimate governmental goal. *See Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) (deeming this *Turner* factor the "sine qua non"). "This factor consists of three sub-requirements": the rule must be (A) "legitimate," (B) "neutral," and (C) "rationally related to [the government's] objective." *Prison Legal News v. Ryan*, 39 F.4th 1121, 1131 (9th Cir. 2022).

a.   *Legitimate*

First, "the governmental objective underlying the policy [must be] legitimate." *Ryan*, 39 F.4th at 1131. The librarians claim that the scanning policy furthers three penological goals: "preventing . . . contraband," "minimizing the coercion of indigent inmates," and advancing "the efficient use of resources." (ECF 168, at 20.) These are legitimate

3

objectives. *See Bell v. Wolfish*, 441 U.S. 520, 551 (1979) (noting that deterring "smuggling contraband" was a legitimate prison goal justifying some limitations on inmates' First Amendment rights); *Rickman v. Avaniti*, 854 F.2d 327, 328 (9th Cir. 1988) (listing "maintaining prison safety" and blocking "contraband" as "important objectives of penal institutions"); *Cook*, 238 F.3d at 1151 (considering how a prison regulation affected the legitimate government objective of "not substantially deplet[ing] prison resources").

### b. *Neutral*

The next question is whether the regulation "operate[s] in a neutral fashion, without regard to the content of the expression." *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989). The scanning policy here applies evenly to all legal documents submitted for copying, regardless of content. Thus, it is neutral. *See Ryan*, 39 F.4th at 1132 (noting that a prison rule is neutral "as long as it applies to specific types of materials solely on the basis of the materials' potential effect on the legitimate objectives" and is "unrelated to the suppression of expression" (citation and quotation marks omitted)).

### c. *Rational Relationship*

Finally, the Court must determine whether there is a rational relationship between the neutral rule and the proffered objective. "The rational-relationship inquiry is highly deferential." *Ryan*, 39 F.4th at 1132. A prison rule fails that inquiry if "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* In fact, courts "may uphold a regulation even if prison officials are unable to prove" that "problems" occurred "in the past" or are "likely to" occur "in the future." *Id.* (quotation marks omitted). "Nor must the officials be able to demonstrate that the policy in fact advances the jail's interests." *Id.* "It is enough that officials might reasonably have thought that the policy would do so." *Id.* (cleaned up).

The policy here comfortably clears that low bar. Although defendants need not prove past problems, they nonetheless offer evidence that "inmates have submitted tattoo templates, gang insignia or logos, personal correspondence, photographs, and pornography as legal documents for copying." (ECF 168-3, at 4.) And "indigent inmates are sometimes

4

coerced by non-indigent inmates to request copies on their behalf in an attempt to avoid copying fees." (*Id.*) The scanning policy helps prevent the spread of contraband and discourages indigent victimization. (*See id.*) At least, an official could rationally think so. After all, as Yablonsky acknowledges, all legal-document copies are returned to the inmate, who takes them "back to [the] inmate[']s yard." (ECF 177, at 62.) Thus, any photocopied contraband—or permissible materials that an indigent inmate was coerced into copying— could easily be distributed to other prisoners.

Yablonsky rejects this reasoning on two grounds. First, he argues that the scanning is unnecessary because inmates are already searched for contraband before entering the library. (ECF 177, at 16, 172; *see also* ECF 168-5, at 72.) But such entryway inspections won't help coerced indigent inmates, nor prevent prisoners from creating banned content after entering the library. For instance, after being frisked at the entrance, an unscrupulous inmate could find a quiet spot in the library, write down elaborate violent plans (or sketch a pornographic drawing), and then present this contraband for copying as "legal documents." A doorway search would not detect or deter such a ruse.

Second, Yablonsky points out that the prison already permits certain erotica and tattoo magazines, so the scanning policy won't stem the tide of body art and pornography. (ECF 177, at 42–43.) This argument is a straw man. The question is not whether the policy helps limit *all* pornography and tattoos, but whether it helps curb *banned* pornography and tattoos. Even if every inmate had prison-approved tattoos and pornography, officials would still have an interest in rooting out more dangerous categories, such as gang-related body art or child pornography. *See Mauro v. Arpaio*, 188 F.3d 1054, 1063 (9th Cir. 1999) (approving a prison's total "prohibition on sexually explicit materials").

At any rate, the "fit" between the policy and the legitimate goal need not be "exact"; it must merely be "rational." *Mauro*, 188 F.3d at 1060. Under this "highly deferential" standard, the Court concludes that the scanning policy is rationally related to a legitimate governmental interest. *See Ryan*, 39 F.4th at 1132. Thus, the most important *Turner* factor favors upholding the prison policy.

### 2. *Alternatives for Inmates*

Under the next *Turner* factor, the Court asks whether inmates retain "alternative means of exercising the right" to seek redress from the courts, that is, without library staff rummaging through their legal documents. *Turner*, 482 U.S. at 90. Yes, they do. Prisoners may bypass the photocopy process altogether and simply mail their original legal documents, without retaining copies. Even for pleadings service, at least in this district, the notice of electronic filing that is automatically sent to all attorneys "constitutes service of the filed document," so no paper copies are required. *See* S.D. Cal. Civ. LR 5.4(c). Yablonsky concedes that if he mailed his original documents without copying them, prison staff would not be permitted to read them. (ECF 168-5, at 32–33; *see also id.* at 368–69 ("Processing Outgoing Confidential Mail" policy).) He also admits that the confidential legal mail services were always available to him. (ECF 168-5, at 32–33.)

Even so, Yablonsky maintains that this option is unreasonable because it means mailing his only copy, which may inhibit his ability to litigate. (ECF 177, at 69.) But inmates who want a record of their legal submissions may manually transcribe copies. Having filed hundreds of handwritten or hand-notated pages already in this matter, Yablonsky is undoubtedly capable of doing so. While this alternative is inconvenient, inmates need not keep paperwork duplicates to prosecute their cases. Thus, Yablonsky has alternatives available to exercise his rights.

### 3. *Impact of Accommodation*

Third, the Court considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Yablonsky proposes that inmates be granted unrestricted photocopying rights for legal matters. But such a policy would inevitably spur the circulation of inflammatory materials, such as gang insignia and banned pornography, making the prison more dangerous for guards and prisoners alike. *See Mauro*, 188 F.3d at 1061 (holding that "unrestricted access to sexually explicit materials would expose the female detention officers . . . to sexual harassment" and "lead to fights between inmates,"

6

jeopardizing "not only the safety of jail employees, but also other inmates"); *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003) ("[P]risons have a legitimate penological interest in stopping prison gang activity."); *Koutnik v. Brown*, 351 F. Supp. 2d 871, 878 (W.D. Wis. 2004) ("Prison officials have a strong interest in suppressing gang activity," including "gang literature or symbols."). As for the proposal's financial impact, officials reasonably believe that prison resources of ink, paper, and staff would be in greater demand. *See Harrell v. Keohane*, 621 F.2d 1059, 1061 (10th Cir. 1980) (rejecting inmate's claimed right to "free unlimited access to a photocopying machine" and noting that prison policies must account for "budgetary considerations"). That would place financial pressure on the institution and impair other inmates' access to these resources. These burdens weigh against Yablonsky's proposal.

### 4. *Prison's Ready Alternatives*

The final *Turner* factor concerns whether "ready alternatives" exist to accommodate an inmate. *Turner*, 482 U.S. at 90. The policy need not be the "least restrictive alternative[,]" but "obvious, easy alternatives" may indicate "the regulation is not reasonable . . . ." *Id.*

Yablonsky proposes several substitutes for the current policy: shaking the documents, fanning them out, scanning them upside down, reviewing the copy machine memory after photocopying, or immediately sealing the copies in envelopes to be mailed from the library. (ECF 177, at 73; ECF 168-5, at 37.) Yet these alternatives do not accomplish the identified goals of suppressing inflammatory materials, protecting indigent inmates, and preserving prison resources. Shaking and fanning papers does not allow librarians to intercept banned tattoo templates or pornography. Likewise, reviewing the photocopier's memory is a feeble defense against written contraband, and it would not save paper and ink. It is merely a retroactive means to identify a wrongdoer, after the contraband has spread and the paper and ink are wasted. (*See* ECF 177, at 14; 464–81; 494–500; 501–02.) Plus, this proposal would allow librarians to read an inmate's documents outside the inmate's presence. That would only exacerbate Yablonsky's privacy concerns. Finally,

7

none of Yablonsky's alternatives, including sealing the copies in the library, addresses the prison's last goal: discouraging well-off inmates from bullying poor ones into making photocopies, to dodge copying fees.

In short, Yablonsky's failure to identify "ready alternatives" supports the scanning policy's "reasonableness." *See Turner*, 482 U.S. at 90. Because all four *Turner* factors favor the current policy, defendants are entitled to summary judgment on Yablonsky's facial challenge.

## C.    As-Applied Challenge to the Scanning Policy

Next, Yablonsky argues that even if the scanning policy is generally constitutional, the librarians are applying it in a way that violates his constitutional rights. He claims that, rather than simply scanning each page, they are "READING" his "protected papers" before copying them. (*See, e.g.*, ECF 177, at 74.) Thus, he asserts that the policy, as applied, violates his free-speech rights.

Assuming these allegations are true, Yablonsky must still overcome the librarians' qualified immunity. The qualified immunity doctrine shields government officials from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). "[P]laintiff bears the burden of proof that the right allegedly violated was clearly established." *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014) (citation and bracketing omitted). Official actions only violate clearly established law "when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation and internal punctuation omitted). Caselaw need not have addressed the precise factual scenario, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations omitted).

In his hunt for a clearly established photocopying right, Yablonsky returns again and again to the well-worn rights regarding legal mail.[1] (*See, e.g.*, ECF 177, at 14–15 (complaining that librarians "read 'EVERY COPYING REQUEST PAGE,'" including "letters drafted to plaintiff['s] lawyer, Courts, and other legal actions"); *id*. at 73 ("right to confidential correspondence").) But his right to private legal correspondence isn't at issue. After all, Yablonsky candidly admits that he freely sends confidential mail and has never witnessed "staff in the [mailroom in the] building read my legal mail." (*See* ECF 168-5, at 33.) The issue here is quite different: Does Yablonsky have a constitutional right to use a copy machine—to memorialize his legal mailings—without close review by prison staff? On this point, the case law is deafeningly silent.

Indeed, precedents cut against Yablonsky. Courts have rejected "any constitutional right to free and unlimited photocopying." *Sands v. Lewis*, 886 F.2d 1166, 1169 (9th Cir. 1989); *see also Jones*, 697 F.2d at 803 ("[B]road as the constitutional concept of liberty is, it does not include the right to xerox."). Photocopying practices typically raise constitutional concerns only when they impede access to courts, which is a high bar. *See, e.g.*, *Johnson v. Moore*, 948 F.2d 517, 521 (9th Cir. 1991) ("A denial of free photocopying does not amount to a [constitutional] denial of access to the courts," absent "actual injury."). As evidenced by Yablonsky's thousands of pages of court filings here, he has ready access to the judicial system. At any rate, this Court has not found—nor has Yablonsky offered—any case holding that a prison librarian's reading of legal papers, by itself, hinders court access. *See Jones*, 697 F.2d at 802–04 (reversing a preliminary

---

[1] Yablonsky also relies heavily on the governing California regulations for photocopies and searches. (*See* ECF 177, at 53–63.) But "an official's clear violation of a state administrative regulation does not allow a § 1983 plaintiff to overcome the official's qualified immunity." *Elder v. Holloway*, 510 U.S. 510, 515 (1994); *see also Campbell v. Burt*, 141 F.3d 927, 930 (9th Cir. 1998) ("As a general rule, a violation of state law does not lead to liability under § 1983.").

injunction that prevented prison librarians from photocopying legal documents "out of [the inmate's] sight").

Perhaps future courts will divine a constitutional right to photocopy free from prying eyes. Or maybe future jurists will conclude that prison officials encroach on First Amendment correspondence rights when they read legal papers—ultimately bound for the post office—before photocopying them. But that day is not yet here. Or, to put it in legal terms, plaintiff has not shown that the constitutional question is "beyond debate." *See Ashcroft*, 563 U.S. at 741. Thus, the librarians have qualified immunity on any claim that they improperly read legal files before copying them.

**D.     Retaliation Claim**[2]

Yablonsky's last claim is that defendants retaliated against him for filing grievances against them. In the prison context, First Amendment retaliation requires: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (citation and footnote omitted). Defendants need only negate one element to prevail. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[C]omplete failure of proof concerning an essential element of [the] case necessarily renders all other facts immaterial."). Yablonsky decries six varieties of retaliation, addressed below.

---

[2] Yablonsky asks the Court to take judicial notice of six other federal complaints against defendants Blahnik, Tiscornia, and McGuire. (ECF 164, at 2–7.) A court may judicially notice a fact that is not "subject to reasonable dispute." Fed. R. Evid. 201(b); *see Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). The existence of these six complaints is not subject to dispute. So the motion is **GRANTED**, in that this Court notices their existence. But those complaints' unproven allegations are not themselves indisputable. So, to the extent Yablonsky offers them as evidence for his own allegations against defendants, the Court accords them no persuasive weight.

18-cv-1122-AGS

### 1. *Reading Plaintiff's Legal Documents*

Yablonsky charges the defendant librarians—Blahnik, Powell, Robles, and Tiscornia—with reading his "legal mail" "to get even [with Yablonsky] for appealing their misconducts about reading legal mail and other requests for relief . . . ." (ECF 62, at 80; *id.* at 80–82.) In other words, after Yablonsky complained about the librarians reading his papers, he insists they "retaliated" against him by . . . reading his papers. This is *continuation*, not retaliation. Yablonsky must show that the librarians mistreated him "because of" his accusations against them. *See Rhodes*, 408 F.3d at 567. Yet he never suggests that the ongoing paper-reading became more frequent or obnoxious post-grievance. Nor does he offer any statements implying that their motivation for reading his papers changed after his complaints.

Thus, no reasonable jury could surmise that the librarians *continued* reading Yablonsky's papers—in the same manner as before his grievance—"because of" that grievance. *See Patkins v. Lisk*, No. 16-CV-04347-EMC, 2017 WL 4773372, at *2 (N.D. Cal. Oct. 23, 2017) (ruling that when prison officials take "adverse action . . . before the protected conduct," that action was not "in retaliation for the protected conduct" (cleaned up)).

### 2. *Limiting Library Access*

According to Yablonsky, the same defendant librarians also retaliated by restricting his library access. (ECF 62, at 80–82.) After filing grievances against them, Yablonsky claims they cut his library hours, violated prison regulations by denying him priority status—that is, at least four hours of weekly library time—and excluded him altogether for the week of October 16 to 22, 2016. (ECF 177, at 17, 142; *see also* ECF 168-5, at 183 (prison operations manual: library priority status).)

There is scant evidence to support Yablonsky's allegation of a retaliatory reduction in library hours. The library's highest priority status—"Priority Legal User (PLU)"—is entitled to "a minimum of 4 hours per calendar week of requested access, as resources are available." (ECF 168-5, at 183.) In the two weeks immediately after Yablonsky's

11

1    October 13, 2016 grievance, he continued to be scheduled library time of at least four hours
2    per week. (*See* ECF 168-5, at 343–45.) In fact, excluding major holidays, he only fell
3    below a "priority" level of scheduled time in 5 of the 54 weeks following that grievance.
4    (*See* ECF 168-5, at 195–345.) On the other hand, in 8 of those same 54 non-holiday weeks,
5    he was slated for at least 10 hours of library access. (*See* ECF 168-5, at 195–97, 202–13,
6    217–20, 226–29, 291–95, 299–302.) On four occasions, post-grievance, he was scheduled
7    for 12 hours of weekly access—more than he ever got before the grievance. (*Compare*
8    ECF 168-5, at 346–64 (pre-grievance; best week of 11 hours and 10 minutes) *with id*.
9    at 202–13, 217–20 (post-grievance; 12 hours).) For reference, the attached appendix
10   summarizes Yablonsky's scheduled library time before and after his prison grievances.[3] It
11   is hard to discern any retaliation from this data.

12       Regardless of the hours, though, Yablonsky complains that he was deprived of
13   library priority. But throughout his incarceration at Donovan, Yablonsky's status ping-
14   ponged between "Preferred Legal User"[4] and "General Legal User." From August 2016
15   until his October 13, 2016 grievance, he was granted Preferred status 55% of the time. (*See*
16   ECF 168-5, at 346–64 (Preferred 12 times, General 10 times).) During his 153 library visits
17   after that grievance, his Preferred rate *improved* to 77%. (*See* ECF 168-5, at 195–346
18   (Preferred 118 times, General 35 times).)

---

[3] Arguably, Yablonsky's protected activity began as early as September 29, 2016, when he mailed Powell a prison Form 22, stating, "I witnessed you reading throu[]gh my legal writings," which "is illegal. . . . PLEASE STOP." (*See* ECF 66, at 94.) But Yablonsky's retaliation case is even weaker with that starting point, as he got a whopping eight hours of library access the very next week. (*See* ECF 168-5, at 348–51.) For Yablonsky's benefit, then, the Court presumes the protected activity started with the October 13, 2016 filing of his Form 602 inmate appeal. (*See* ECF 66, at 117–18.)

[4] Although prison regulations define a "Priority Legal User (PLU)" (*see* ECF 168-5, at 176–77, 183), the prison library log uniformly uses the term "Preferred Legal User." (*See, e.g.*, ECF 168-5, at 195–220.)

12

Yablonsky might argue, however, that post-grievance, he was relegated to General status for each of his next eight library trips (and 13 of his next 14). (*See* ECF 168-5, at 325–46; *see also* appendix, below.) But this designation did not appreciably impair his library use. From the filing of his grievance until the end of 2016, he was granted the equivalent of a priority-level time allotment—that is, at least four hours—in seven of nine weeks, excluding major holidays. (*See* ECF 168-5, at 323–46.) In any event, there is no evidence that he was ever misclassified as a General Legal User. Under prison rules, an inmate's "Priority Legal User" status begins "no earlier than 30 calendar days before [an] established court deadline," unless the inmate demonstrates "extraordinary circumstances." (ECF 168-5, at 184; *see also id.* at 178 (limiting priority access to "no more than 30 days prior to the expiration of their court deadline").) And prisoners must specifically "apply for PLU status." (ECF 168-5, at 183.) Yablonsky has not pointed to any relevant court deadlines, extraordinary circumstances, or other evidence showing a request for Preferred status was improperly denied.

Yablonsky next contends that defendants excluded him from the library entirely for the week of October 16, 2016. But the library log tells a different story. That week Yablonsky was scheduled for four hours, with two-hour blocks on both October 20 and October 21. (ECF 168-5, at 344–46.) Yablonsky insists, however, that he never made those appointments and that "[s]ome weeks I didn't get any [library time]." (*See* ECF 168-5, at 57.) But there is no evidence that the defendant *librarians* were responsible for this. Instead, Yablonsky offers substantial evidence that nonlibrary staff were to blame for not escorting prisoners to the library. (*See, e.g.*, ECF 177, at 494 ("[T]he library relies on [nonlibrary] staff who regularly fail to honor the [appointment slips]" and "regularly refuse escorts."); *id.* at 495–500 (same); *cf.* ECF 168-5, at 27 (Question: "The librarian may grant the [library] request but the [nonlibrary] officer doesn't provide you with a ducat [appointment slip]. Is that correct?" Answer: "Correct.").) Other times, it seems Yablonsky missed his library dates due to conflicting medical visits. (*See, e.g.*, ECF 168-5, at 334–35

(December 2, 2016 library appointment "Bumped by another Appt" for "Health Services"); *id*. at 307–08 (same on February 3, 2017).)

In short, there is no proof that the librarians ever thwarted Yablonsky's library visits. To the contrary, every time a named defendant scheduled Yablonsky's library appointments, he was booked for at least four hours. (*See* ECF 168-5, at 236–38 (Tiscornia scheduled one week of 4 hours); *id*. at 286–87 (Powell scheduled one week of 6 hours); *id*. at 195–217, 225–29, 283–85 (Robles scheduled ten separate weeks of 4, 6, 6, 8, 8, 10, 10, 12, 12, and 12 hours).) And every time he was allotted less than four hours, it was by another librarian—not one of the named defendants. (*See, e.g*., ECF 168-5, at 241–47.)

Yablonsky dismisses all this evidence as a smoke screen. He accuses defendants of fabricating records to hide their retaliatory scheduling. In particular, he notes that the identification number for the September 1, 2016 entry is out of order for that week. (ECF 177, at 163; ECF 168-5, at 362.) Also, this dubious entry's number is only seven digits, while the rest are eight. (ECF 177, at 163.) But this supposedly bogus entry is for a date before Yablonsky's grievances, so it is not clear how it would aid a cover-up of any improper bookings. At any rate, Yablonsky offers no proof that the librarians are to blame for any tampered records, nor any indication of what the true scheduling data should be. With no evidence of defendants' vindictive scheduling—and much evidence of their generous scheduling—this retaliation theory is meritless.

### 3. *Confiscation of Legal Paperwork*

Yablonsky also accuses the litigation coordinator, defendant McGuire, of retaliating against him by dispatching guards to his cell to confiscate legal papers. (*See* ECF 177, at 20–22; ECF 168-5, at 127–28.) McGuire responds that there is no evidence she participated in—or was even aware of—this cell search, and thus Yablonsky "cannot meet the adverse action" element. (*See* ECF 168, at 29.)

Although Yablonsky has no direct proof that McGuire conspired to take his paperwork, he points to four pieces of circumstantial evidence of her culpability. First, the timing. According to Yablonsky, he used "secur[e] institutional mail" to send McGuire a

14

letter for "assistance in processing" a grievance "about misconduct by staff in[] the law library." (ECF 62, at 54; *see also* ECF 177, at 144.) He claims that "within an hour" of McGuire receiving that letter, officers searched his cell and took some legal files. (ECF 62, at 54; ECF 177, at 144.) Based on this sequence of events, Yablonsky presumes that McGuire read his letter and swiftly ordered his legal papers seized.

This theory collapses due to a complete lack of proof. Yablonsky offers no evidence that McGuire even read the letter "within an hour" of its delivery, nor that she had the authority or wherewithal to direct a cell search. (*See* ECF 168-5, at 373 (McGuire emailing that she was "not aware of what transpired" until Yablonsky's family informed her that "his property was taken from his cell").) What's more, Yablonsky hasn't explained McGuire's retaliatory motive. The letter raised complaints against *library staff*—not against McGuire. (*See* ECF 177, at 143–44.) And as litigation coordinator, McGuire routinely processed such inmate grievances. (*See* ECF 168-5, at 371.) It is unclear why criticism of an unrelated prison department would ignite her retaliatory wrath. Yablonsky's claim that he "did one thing [sending McGuire a letter], and subsequently the other thing happened [cell search] . . . is, in the factual context of this case, insufficient" to infer retaliation, let alone that *McGuire* retaliated. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996).

Yablonsky's second argument is that the guard who searched his cell knew of his prison grievance, presumably from McGuire. (*See* ECF 168-5, at 127–28.) There are several problems with this point. Initially, it's a strained reading of the record. When Yablonsky asked why the guard was taking his legal files, the guard twice replied, "I don't know." (ECF 168-5, at 128.) The guard then asked, "Did you write somebody up?" (*Id*.) Yablonsky responded, "Yeah, I did[.] I filed several appeals." (*Id*.) So the guard replied, "Oh, that's probably it." (*Id*.) In other words, the guard seemed unaware of the grievances until Yablonsky told him. But even if this colloquy could be read to suggest the guard learned of them beforehand—and not from Yablonsky himself—it does not prove that

15

*McGuire* told him. In sum, even with generous leaps of faith and logic, the guard's statements do little to link McGuire to any adverse action.

Third, Yablonsky interprets McGuire's post-search assurance that "'she' would have [his papers] returned" as an implicit confession that she had them seized. (ECF 168-5, at 128.) But that's like saying: When a detective assures distraught parents that he will get their missing child returned, it's a tacit admission of kidnapping. These statements don't imply a guilty conscience when it's their job to find and recover what was stolen. It was McGuire's duty to restore Yablonsky's legal files if other prison staff improperly took them. (*See* ECF 168-5, at 371 (litigation coordinator's major duty is ensuring that litigation "issues are adequately addressed").)

Finally, Yablonsky emphasizes that McGuire worked in the prison system for over "nine years" and "as litigation coordinator" for two years. (ECF 177, at 79.) But McGuire's nearly decade-long tenure doesn't imply she's prone to improper reprisals against inmates. It suggests the opposite. And in her role as litigation coordinator, she has no apparent authority to order cell searches. (*See* ECF 168-5, at 371.) Rather, she "advise[s] management" on "Litigation issues," so she would be especially attuned to avoiding new legal trouble for the prison. (*See id*.)

Even taken together, these circumstances would not lead a reasonable juror to believe McGuire ordered Yablonsky's legal paperwork seized or that she was involved in any other adverse action against him.

### 4. *Withdrawn Grievance*

Yablonsky alleges that a "senior educator" at the prison, defendant Martinez, retaliated against him by tricking him into withdrawing a grievance.[5] (ECF 62, at 82; *see also* ECF 168-5, at 82–83.) On January 20, 2017, Yablonsky and Martinez had their first-ever meeting, so that Martinez could interview Yablonsky about his "appeal against the

---

[5] To the extent Yablonsky is trying to bring an access-to-courts claim against Martinez, that claim was previously dismissed with prejudice. (*See* ECF 79, at 5.)

16

law library." (*See* ECF 168-5, at 83, 112–13; ECF 177, at 123.) During that interview, Martinez said that if this "staff complaint goes through there is some possibility that these people [defendant librarians] are going to lose their jobs." (ECF 168-5, at 84.) According to Yablonsky, Martinez thus "manipulated" him into withdrawing his complaint. (*Id.* at 89.) Yablonsky said, "I don't want nobody to lose their jobs." (*Id.* at 84–85.) He then handwrote into the "request to withdraw" section of the prison appeal that he would "waive" his grievance. (*Id.* at 85–86.) But Yablonsky claims this was all a "bait and switch." (ECF 177, at 123; ECF 168-5, at 83.) While he assumed Martinez held in his hand the library-access complaint, it was in fact the grievance about defendant McGuire confiscating his legal files. (ECF 168-5, at 89, 92.) So, Yablonsky unwittingly withdrew the complaint against McGuire, not against the librarians.

The defense argues that Yablonsky has not proven Martinez's "retaliatory motive." (ECF 168, at 30.) The closest Yablonsky comes to addressing this element is his assertion that Martinez: (1) spoke to librarian Powell, (2) was "from[ ]the same union, attend[ed] the [same] education meetings, and knew" Powell, and (3) wanted to "help his fellow union member [Powell]." (ECF 177, at 123–24.) The problem is that Martinez *didn't* help Powell. He hurt Powell, in Yablonsky's telling. After all, Yablonsky was ready to dismiss his grievance against Powell and the other librarians. Martinez's "bait and switch" diverted that dismissal to McGuire, at Powell's *expense*.

Because Yablonsky cannot prove Martinez's retaliatory motive, Martinez is entitled to summary judgment on any claim that Martinez duped him into withdrawing a grievance.

### 5.  *Tampered Outgoing Mail*

After Yablonsky finally mailed his legal papers, they were returned with a label over the address. (ECF 62, at 83.) He believes that McGuire "somehow influenced the mishandling of the legal mail and placed labels over the numeric portion of the address to prevent delivery." (ECF 177, at 124–25.) She did so, he argues, because Yablonsky named her as a defendant. (ECF 168-5, at 148.) McGuire deems all of this "too speculative to proceed to trial." (ECF 168, at 31.)

17

Although Yablonsky claims that "there is more than enough evidence to show McGuire . . . had enough 'FRIENDS' at [the prison] to tamper with the mail," (ECF 177, at 50), he offers only conjecture, not proof. Yablonsky admits that he handed this legal mail to "Correction staff in Housing Unit 18," not McGuire. (ECF 168-5, at 152.) He is simply "assuming" that because he sued McGuire, "she held some advanced responsibility" for the tampering. (ECF 168-5, at 153.) At one point, he candidly conceded that he did not "know exactly who the [tampering] parties are," but that he believes "the litigation coordinator plays a role in whether these mailings are being delivered." (ECF 168-5, at 145.) But there is no factual basis for these assumptions. McGuire did not work in the mail room. (ECF 168-4, at 2.) Nor was she involved in "the processing of . . . confidential legal mail." (*Id.*; *see* ECF 168-5, at 371.) Nor is there evidence that she spearheaded a mailroom conspiracy.

Even if McGuire knew she was named in this lawsuit, Yablonsky offers nothing but guesswork for how she tampered with his mail. "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson*, 83 F.3d at 1081–82. McGuire is entitled to summary judgment on this ground, too.

### 6. *Rules Violation Report*

Finally, Yablonsky alleges that defendant Robles retaliated against him by issuing a rules violation report for unused library sessions. (ECF 62, at 61–62, 80–81; ECF 66, at 313; ECF 168-5, at 122.) Although Yablonsky admits missing library time, he explains that on each occasion he "had already been there" for an earlier session or he had to leave early because "I go as much as I can," but "[m]y eyes can't handle anymore." (*See* ECF 168-5, at 122.) The defense argues that Robles had no "retaliatory motive" and that he issued the citation "for legitimate penol[o]gical reasons." (ECF 168, at 31.)

By writing up Yablonsky for squandering library appointments, Robles in fact "reasonably advance[d] a legitimate correctional goal." *See Rhodes*, 408 F.3d at 567–68. "[L]imiting law library access is inherent in managing a limited resource for a large group of individuals who all want to use it . . . ." *Halbert v. Herbert*, No. C 03-0237 JF (PR),

2008 WL 4460213, at *5 (N.D. Cal. Sept. 30, 2008). Each law-library session at Donovan prison is capped at "twelve (12) Law Library users." (*See* ECF 168-5, at 176.) When Yablonsky is repeatedly assigned time he doesn't use, it could deprive other inmates of library turns. To conserve library resources, prison staff may thus set and enforce rules to ensure prisoners maximize their allotted time.

But Yablonsky also complains that this is a "fake rule" that "does not exist." (ECF 62, at 61, 81.) Not true. Section 101120.10 of the prison's operations manual supplement states that any inmate who "does not attend their [assigned library] session will be subject to progressive discipline," and that "the initial incident will result in a Counseling Only Rules Violation Report." (ECF 168-5, at 177.) Robles issued Yablonsky a "Counseling Only" rules violation report, citing this exact rule. (ECF 66, at 313.) Thus, even in the light most favorable to Yablonsky, any reasonable juror would find that Robles's actions "reasonably advance[d] a legitimate correctional goal." *Rhodes*, 408 F.3d at 567–68.

## CONCLUSION

As there is no genuine issue for trial on any of Yablonsky's claims and no reasonable jury could find in his favor, defendants' summary-judgment motion is **GRANTED**. The Clerk of Court shall enter judgment in favor of defendants on all claims and close the case.

Dated: September 30, 2022

_____

Hon. Andrew G. Schopler
United States Magistrate Judge

19

18-cv-1122-AGS

# APPENDIX
## *Yablonsky's Scheduled Library Hours*

| Week Starting | Hours Scheduled | | Citation ECF 168-5, at . . . | Major Holidays |
|---|---|---|---|---|
| | Under 4 Hours | 4 Hours or More | | |
| 8/21/2016 | | 11 hours, 10 mins. | 363–64 | |
| 8/28/2016 | | 8 hours, 30 mins. | 361–63 | |
| 9/04/2016 | | 8 hours | 357–60 | |
| 9/11/2016 | | 4 hours | 356 | |
| 9/18/2016 | | 4 hours | 355–56 | |
| 9/25/2016 | | 4 hours | 351–54 | |
| **September 29, 2016: *Yablonsky files Form 22 about librarians.* (ECF 66, at 94.)** | | | | |
| 10/2/2016 | | 8 hours | 348–51 | |
| 10/9/2016 | | 4 hours | 346–48 | |
| **October 13, 2016: *Yablonsky files Form 602 about librarians.* (ECF 66, at 117–18.)** | | | | |
| 10/16/2016 | | 4 hours | 344–45 | |
| 10/23/2016 | | 4 hours | 343–44 | |
| 10/30/2016 | 2 hours | | 342 | |
| 11/6/2016 | 2 hours | | 337–41 | |
| 11/13/2016 | | 4 hours | 335–37 | |
| 11/20/2016 | *0 hours* | | 188 | *Thanksgiving week* |
| 11/27/2016 | | 4 hours, 10 mins. | 333–34 | |
| 12/4/2016 | | 4 hours | 328–32 | |
| 12/11/2016 | | 4 hours | 325–27 | |
| 12/18/2016 | | 4 hours | 323–25 | |
| 12/25/2016 | *0 hours* | | 189 | *Christmas week* |
| 1/1/2017 | *2 hours* | | 316–18 | *New Year's week* |
| 1/8/2017 | | 4 hours | 314–15 | |
| 1/15/2017 | | 4 hours | 312–13 | |
| 1/22/2017 | | 8 hours | 308–11 | |
| 1/29/2017 | | 6 hours | 305–07 | |
| 2/5/2017 | | 6 hours | 302–05 | |
| 2/12/2017 | | 10 hours | 299–302 | |
| 2/19/2017 | | 4 hours | 298–99 | |
| 2/26/2017 | | 6 hours | 295–97 | |
| 3/5/2017 | | 10 hours | 291–95 | |
| 3/12/2017 | 2 hours | | 290 | |
| 3/19/2017 | | 4 hours | 288–89 | |
| 3/26/2017 | | 6 hours | 286–87 | |

20

| | | | | |
|---|---|---|---|---|
| 4/2/2017 | | 8 hours | 283–85 | |
| 4/9/2017 | | 6 hours | 281–83 | |
| 4/16/2017 | | 6 hours | 279–81 | |
| 4/23/2017 | | 4 hours | 277–78 | |
| 4/30/2017 | | 4 hours | 275–76 | |
| 5/7/2017 | | 4 hours | 272–74 | |
| 5/14/2017 | | 6 hours | 270–71 | |
| 5/21/2017 | | 8 hours | 263–69 | |
| 5/28/2017 | | 6 hours | 261–62 | |
| 6/4/2017 | | 4 hours | 258–60 | |
| 6/11/2017 | | 4 hours | 257–58 | |
| 6/18/2017 | | 4 hours | 254–56 | |
| 6/25/2017 | | 6 hours | 251–53 | |
| 7/2/2017 | | 6 hours | 250–51 | |
| 7/9/2017 | | 4 hours | 248–49 | |
| 7/16/2017 | | 4 hours | 247–48 | |
| 7/23/2017 | 2 hours | | 245–47 | |
| 7/30/2017 | 2 hours | | 241–44 | |
| 8/6/2017 | | 4 hours | 239–41 | |
| 8/13/2017 | | 4 hours | 236–38 | |
| 8/20/2017 | | 4 hours | 233–35 | |
| 8/27/2017 | | 4 hours | 230–32 | |
| 9/3/2017 | | 10 hours | 226–29 | |
| 9/10/2017 | | 4 hours | 225–26 | |
| 9/17/2017 | | 6 hours | 221–24 | |
| 9/24/2017 | | 12 hours | 217–20 | |
| 10/1/2017 | | 6 hours | 213–17 | |
| 10/8/2017 | | 12 hours | 210–13 | |
| 10/15/2017 | | 12 hours | 206–09 | |
| 10/22/2017 | | 12 hours | 202–05 | |
| 10/29/2017 | | 8 hours | 200–02 | |
| 11/5/2017 | | 6 hours | 198–99 | |
| 11/12/2017 | | 10 hours | 195–97 | |

18-cv-1122-AGS